## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4100
Washington, DC 20530,

       *Plaintiff,*

   v.

ANHEUSER-BUSCH InBEV SA/NV
Brouwerijplein, 1
3000 Leuven
Belgium,

and

SABMILLER plc
SABMiller House
Church Street West
Woking, Surry
GU21 6HS
United Kingdom,

       *Defendants.*

Case No.

## **COMPLAINT**

1.    The United States of America brings this civil antitrust action to enjoin Anheuser-Busch InBev SA/NV ("ABI") from acquiring SABMiller plc ("SABMiller").  The United States alleges as follows:

## I.   NATURE OF THE ACTION

2.   On November 11, 2015, ABI agreed to acquire SABMiller in a transaction valued at $107 billion.

3.   ABI is the largest brewing company both in the United States and worldwide.  In the United States, ABI accounts for approximately 47% of all beer sales.[1]

4.   SABMiller is the second-largest global brewing company.  In the United States, SABMiller owns 58% of MillerCoors LLC ("MillerCoors"), which is a joint venture between SABMiller and Molson Coors Brewing Company ("Molson Coors").  In the United States, MillerCoors is the second-largest brewing company, accounting for 25% of all beer sales, and is ABI's largest competitor.

5.   ABI and MillerCoors are the two largest brewers in local beer markets throughout the United States and have combined market shares that range from 37% to 94% of beer sales in 58 Metropolitan Statistical Areas ("MSA") in the United States.[2]  In more than 15 of these MSAs, ABI and MillerCoors jointly account for 70% or more of beer sales.

6.   ABI's proposed acquisition of SABMiller would give ABI a majority ownership interest in and 50% governance rights over MillerCoors.  Consequently, this transaction would eliminate head-to-head competition between the two largest brewers in the United States—ABI and MillerCoors—both nationally and in every local market in the United States.  This reduction in competition would likely result in increased beer prices and fewer choices for beer consumers across the United States.

---

[1] National market shares are based on dollar-sales data from IRI, a market research firm, whose data are commonly used by industry participants.  The national market shares reflect only off-premise sales.  ABI accounts for approximately 35% of dollar sales of beer made only through grocery stores.

[2] The MSAs are defined by IRI.  These 58 MSAs represent every MSA in the United States for which reliable data are available at the MSA level.  MSA-level data reflect dollar sales of beer only through grocery stores.

7.     This transaction threatens other likely anticompetitive effects.  ABI's proposed acquisition of SABMiller would increase ABI's incentive and ability to disadvantage its remaining rivals by limiting or impeding the distribution of their beers, thereby restricting their ability to serve the millions of Americans who spend over $100 billion on beer every year. These exclusionary effects would fall especially on brewers and consumers of high-end beers that have served as an important constraint on ABI's ability to raise the price of its beers, and thus would allow ABI to charge consumers higher prices for its beers.

8.     ABI, as the largest U.S. brewer, uses a variety of practices and contractual provisions to promote exclusivity from distributors that sell ABI beer.  Among other things, ABI has established financial incentive programs that reward distributors based on the percentage of ABI beer that a distributor sells as compared to the beer of ABI competitors.  Moreover, ABI insists on contractual terms that limit a distributor's ability to promote and sell a competitor's beer.  If permitted to acquire SABMiller, ABI would be able to expand these practices in its current distribution channel and to pursue a similar strategy with distributors that currently sell the beers of MillerCoors and third-party rivals.  Consequently, ABI's acquisition of a controlling interest in MillerCoors via its acquisition of SABMiller would likely harm competition by undermining the ability of its remaining rivals to compete with ABI, leading to higher prices, fewer choices, and less innovative products for U.S. beer consumers.

9.     For these reasons, ABI's proposed acquisition of SABMiller violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be permanently enjoined.

## II.     JURISDICTION, VENUE, AND INTERSTATE COMMERCE

10.     The United States brings this action pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain Defendants ABI and SABMiller from violating

Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18. The Court has subject matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

11.     ABI and SABMiller produce and sell beer in the flow of interstate commerce and their production and sale of beer substantially affect interstate commerce. ABI and SABMiller have each consented to personal jurisdiction and venue in this judicial district for purposes of this action. Venue is proper for ABI, a Belgium corporation, and SABMiller, a United Kingdom corporation, in this judicial district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391.

## III.     THE DEFENDANTS AND THE UNITED STATES BEER INDUSTRY

### A.     The Defendants

12.     ABI is a corporation organized and existing under the laws of Belgium, with its headquarters in Leuven, Belgium. ABI owns and operates 19 breweries in the United States. ABI owns more than 40 major beer brands sold in the United States, including Bud Light—the top-selling beer brand in the United States—and other popular beer brands, such as Budweiser, Busch, Michelob, Natural Light, Stella Artois, Shock Top, Goose Island, and Beck's.

13.     SABMiller is a corporation organized and existing under the laws of the United Kingdom, with its headquarters in London, England. SABMiller operates in the United States through its 58% ownership interest in the MillerCoors joint venture.

14.     MillerCoors is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois. Under MillerCoors' corporate governance structure, SABMiller and Molson Coors, through their designated representatives, have an equal right to govern MillerCoors. MillerCoors owns and

operates 12 breweries in the United States.  MillerCoors has the sole right to produce and sell in

the United States more than 40 major brands of beer, including Coors Light and Miller Lite—the

second- and fourth-highest selling beer brands in the United States.  MillerCoors also has the

right to produce and sell in the United States other popular beer brands, such as Miller Genuine

Draft, Coors Banquet, and Blue Moon.  In addition, MillerCoors has the exclusive right to import

into and sell in the United States certain beer brands owned by SABMiller, including Peroni,

Grolsch, and Pilsner Urquell.

**B.      Beer Segments in the United States**

15.      Beers sold in the United States are segmented based on price and quality.  Beers

in the United States can generally be grouped into three segments:  sub-premium, premium, and

high-end.  A large majority of the beers sold by ABI and MillerCoors in the United States fall

into the premium and sub-premium beer segments.

16.      The sub-premium segment, also referred to as the value segment, generally

consists of lager beers, such as Natural and Keystone branded beer, and some ales and malt

liquor.  Sub-premium beers are priced lower than premium beers and are generally perceived as

being of lower quality than premium beers.

17.      The premium segment generally consists of medium-priced American lager beers,

such as ABI's Budweiser, and the Miller and Coors brand families, including the "light"

varieties.[3]

18.      The sub-premium and premium segments accounted for 69% of all beer sold in

the United States in 2015.

---

[3]  ABI also identifies a "premium plus" segment that consists largely of American beers that are priced somewhat
higher than Budweiser and Bud Light.  Examples of beers that ABI identifies as "premium plus" beers include Bud
Light Lime, Bud Light Platinum, Bud Light Lime-a-Rita, and Michelob Ultra.

19.     The high-end segment generally consists of craft beers, which are often produced in small-scale breweries, and imported beers.  High-end beers sell at a wide variety of prices, most of which are higher than the prices for premium beers.  Examples of high-end craft beers include Dogfish Head, Flying Dog, and Sam Adams.  Examples of high-end imports include Corona, Stella Artois, and Peroni.

20.     High-end beers account for a much smaller portion of the beer sold by ABI and MillerCoors in the United States than premium and sub-premium beer.  However, over the last five years, the high-end beer segment's market share in the United States has increased from 21% to 31%, while the market share of the premium and sub-premium segments has decreased from 79% to 69%.

21.     Historically, ABI has employed a "price leadership" strategy whereby ABI, as the largest U.S. brewer, seeks to establish industry-wide price increases by being the first brewer to announce its prices for the upcoming year.  In most local markets, ABI is the market share leader and issues its price announcement first, purposely making its price increases transparent to the market so its competitors will follow its lead.  These price increases vary by region, but typically cover a broad range of beer brands and packages.

22.     For many years, MillerCoors has followed ABI's price increases to a significant degree.

23.     Brewers with a broad portfolio of beer brands, such as ABI and MillerCoors, seek to maintain "price gaps" between each beer segment to minimize competition across segments. As ABI has continued to raise premium prices, it is increasingly concerned about the threat of high-end brands constraining its ability to lead future price increases.  As the prices of premium brands approach the prices of high-end brands, consumers are increasingly willing to trade up

6

from one category of brands to another. Consequently, competition in the high-end beer segment serves as an important constraint on the ability of ABI and MillerCoors to raise—either unilaterally or through coordination—beer prices in the United States.

### C.    Beer Distribution in the United States

24.    Most brewers use distributors to merchandise, sell, and deliver beer to retailers. Those retailers are primarily grocery stores, large retailers (such as Target and Walmart), convenience stores, liquor stores, restaurants, and bars. Retailers, in turn, sell beer to consumers. Beers brewed in foreign countries are typically sold to an importer that resells the beer to distributors.

25.    Distributors owned by ABI currently distribute about 9% of ABI's beer in the United States. These distributors typically distribute only brands that are owned by or affiliated with ABI. To the extent that ABI-owned distributors sell beer brands that are not owned by or affiliated with ABI, those brands tend to be local craft beers with limited sales and high operating costs.

26.    Almost all of the remaining volume of ABI's beer is sold by distributors who sell large volumes of ABI beer, including the Budweiser and Bud Light brands of beer, but are not owned by ABI ("ABI-Affiliated Wholesalers"). ABI beer brands account for approximately 90% by volume, on average, of the beer sold by ABI-Affiliated Wholesalers. ABI-Affiliated Wholesalers often also distribute high-end beers that compete with ABI's beers, such as Heineken or Sam Adams.

27.    ABI exerts considerable influence over ABI-Affiliated Wholesalers, in part by requiring that these distributors enter into a Wholesaler Equity Agreement ("Equity Agreement") with ABI. The Equity Agreement contains a number of provisions that are designed to

encourage ABI-Affiliated Wholesalers to sell and promote ABI's beer brands instead of the beer brands of ABI's competitors.

28.     For example, the Equity Agreement prohibits an ABI-Affiliated Wholesaler from requesting that a bar replace an ABI tap handle with a competitor's tap handle or that a retailer replace ABI shelf space with a competitor's beer.  Further, the Equity Agreement prohibits an ABI-Affiliated Wholesaler from compensating its salespeople for their sales of competing beer brands (such as a dollar-per-case incentive) unless it provides the same incentives for sales of certain ABI beer brands.

29.     ABI also provides payments to ABI-Affiliated Wholesalers based on their ABI "alignment," that is, the amount of ABI beer that they sell relative to the beer of ABI competitors.  For example, under a program known as the Voluntary Anheuser-Busch Incentive for Performance Program, ABI offers ABI-Affiliated Wholesalers that are 90% or more "aligned" a payment for each case-equivalent of ABI beer they sell.  The size of the payment increases based on the ABI-Affiliated Wholesaler's level of alignment.  Only the sales of very small, local craft beers are excluded from the calculation of an ABI-Affiliated Wholesaler's level of alignment.

## IV.     THE RELEVANT MARKET

### A.     Relevant Product Market

30.     Beer is a relevant product market and line of commerce under Section 7 of the Clayton Act.  Beer is usually made from a malted cereal grain, flavored with hops, and brewed via a fermentation process.  Beer's taste, alcohol content, image, price, and other factors make it substantially different from other alcoholic beverages.

31.     Other alcoholic beverages, such as wine and distilled spirits, are not sufficiently substitutable to discipline a small but significant and non-transitory increase in the price of beer, and relatively few consumers would substantially reduce their beer purchases in the event of such a price increase.  Therefore, a hypothetical monopolist producer of beer likely would increase its prices by at least a small but significant and non-transitory amount.

### B.    Relevant Geographic Market

32.     ABI and MillerCoors are the two largest brewers in local markets throughout the United States.  Appendix A lists the 58 MSAs in the United States for which reliable data on beer sales are available.  These and the other MSAs in the United States are relevant geographic markets for antitrust purposes.  These local markets currently benefit from head-to-head competition between ABI and MillerCoors, and in each local market the proposed acquisition would likely substantially lessen competition.

33.     The relevant geographic markets for analyzing the effects of the proposed acquisition are best defined by the locations of the customers who purchase beer, rather than by the locations of breweries.

34.     Brewers develop pricing and promotional strategies based on an assessment of local demand for their beer, local competitive conditions, and local brand strength.  Thus, the price for a brand of beer can vary by local market.

35.     Brewers are able to price differently in different locations, in part because arbitrage across local markets is unlikely to occur.  Consumers buy beer near their homes and typically do not travel to other areas to buy beer when prices rise.  Also, distributors' contracts with brewers and importers contain territorial limits and prohibit distributors from reselling beer

outside their territories. In addition, each state has different laws and regulations regarding beer distribution and sales that would make arbitrage unfeasible.

36.     A hypothetical monopolist of beer sold in each MSA in the United States would likely increase its prices in that local market by at least a small but significant and non-transitory amount. Therefore, these areas are relevant geographic markets and "sections of the country" within the meaning of Section 7 of the Clayton Act.

37.     Competition also exists among brewers on a national level, which affects local markets throughout the United States. Decisions about beer brewing, marketing, and brand building typically take place on a national level. In addition, a significant portion of beer advertising is placed on national television, and brewers commonly compete for national retail accounts. General pricing strategy also typically originates at a national level.

38.     A hypothetical monopolist of beer sold in the United States would likely increase its prices by at least a small but significant and non-transitory amount. Accordingly, the United States is a relevant geographic market under Section 7 of the Clayton Act.

## V.    ABI'S ACQUISITION OF SABMILLER IS LIKELY TO RESULT IN ANTICOMPETITIVE EFFECTS

### A.    The Relevant Markets are Highly Concentrated and the Proposed Acquisition is Presumptively Illegal

39.     The relevant beer markets are highly concentrated and would become significantly more concentrated as a result of the proposed acquisition. ABI and MillerCoors jointly account for approximately 72% of the national beer market. In every local market for which reliable data are available, ABI and MillerCoors have a combined market share that ranges from 37% to 94%. Indeed, in 18 MSAs, ABI and MillerCoors have a combined market share of 70% or greater. *See* Appendix A.

10

40.     Market concentration is often one useful indicator of the level of competitive vigor in a market and the likely competitive effects of a merger.  The more concentrated a market, and the more a transaction would increase concentration in a market, the more likely it is that the transaction would result in harm to consumers by meaningfully reducing competition.

41.     Concentration in relevant markets is typically measured by the Herfindahl-Hirschman Index (or "HHI," defined and explained in Appendix B).  Markets in which the HHI is in excess of 2,500 points are considered highly concentrated.  *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* ¶ 5.3 (revised Aug. 19, 2010) ("*Merger Guidelines*"), https://www.justice.gov/atr/horizontal-merger-guidelines-08192010.

42.     The beer industry in the United States is highly concentrated and would become even more concentrated as a result of ABI's proposed acquisition of SABMiller.  Market share estimates demonstrate that nationally, and in all but three local geographic markets identified in Appendix A, the post-acquisition HHI would exceed 2,500 points.  In one local market (the Wichita, Kansas MSA), the post-acquisition HHI would be more than 8,900.  Moreover, the HHI would increase in every relevant geographic market by at least 680 points.  Based on the resulting HHI measures of concentration, and the increase in concentration that would result from the transaction, ABI's proposed acquisition of SABMiller is presumptively anticompetitive. *See Merger Guidelines* ¶ 5.3.

### B.     ABI's Acquisition of SABMiller Would Eliminate Head-to-Head Competition Between ABI and MillerCoors

43.     Today, ABI and MillerCoors compete directly against each other both nationally and in every local market in the United States.

44.     ABI's proposed acquisition of SABMiller would give ABI a majority ownership interest in and 50% governance rights over MillerCoors and thereby eliminate competition

between the two largest beer brewers in the United States.  Thus, ABI's acquisition of

SABMiller would likely substantially lessen competition both nationally and in every local

market in the United States, and therefore violate Section 7 of the Clayton Act.

      **C.**      **ABI's Acquisition of SABMiller Would Increase ABI's Incentive and Ability to Disadvantage High-End Rivals by Limiting Their Distribution**

45.      ABI's proposed acquisition of SABMiller would also harm competition by

increasing ABI's incentive and ability to engage in anticompetitive conduct that limits and

impedes the distribution of its high-end rivals' beer.  With the elimination of MillerCoors as a

competitive constraint, ABI's high-end rivals would become a more important constraint on

ABI's ability to raise beer prices.

46.      ABI currently encourages ABI-Affiliated Wholesalers to limit their sales of the

beers of ABI's high-end rivals through the Equity Agreement and ABI's incentive programs.

Consequently, the beers of ABI's competitors account for only a small percentage of the sales of

many ABI-Affiliated Wholesalers.  ABI has also purchased distributors in states in which those

purchases are legal, allowing ABI directly to limit sales of ABI's high-end rivals.

47.      After the proposed acquisition, ABI would have a greater incentive and ability to

invest resources in distributor acquisitions and to use practices that restrict its rivals' access to

distribution.  With control over the MillerCoors brands, ABI could encourage the distributors of

both ABI brands and MillerCoors brands to limit their sales of high-end rivals' beer, which

would likely result in increased beer prices and fewer choices for consumers.

**VI.**      **ABSENCE OF COUNTERVAILING FACTORS**

48.      New entry and expansion by competitors likely will not be timely and sufficient

in scope to prevent the acquisition's likely anticompetitive effects.  Barriers to entry and

expansion within each relevant market include:  (i) the substantial time and expense required to

build a brand's reputation; (ii) the substantial sunk costs for promotional and advertising activity needed to secure the distribution and placement of a new entrant's beer products in retail outlets; (iii) the time and cost of building new breweries and other facilities; and (iv) the difficulty of developing an effective network of beer distributors with incentives to promote and expand a new entrant's sales.

49.     The anticompetitive effects of the proposed acquisition are not likely to be eliminated or mitigated by any efficiencies the proposed acquisition may achieve.

## VII.   VIOLATION ALLEGED

50.     The United States hereby incorporates the allegations of paragraphs 1 through 49 above as if set forth fully herein.

51.     The proposed transaction would likely substantially lessen competition in interstate trade and commerce, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and would likely have the following anticompetitive effects, among others:

(a)     head-to-head competition between ABI and MillerCoors for beer sales in the relevant geographic markets would be eliminated or substantially lessened; and

(b)     competition generally in the relevant geographic markets for beer would be substantially lessened.

### REQUESTED RELIEF

The United States requests:

1.     That the proposed acquisition be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. §18;

13

2.      That Defendants be permanently enjoined and restrained from carrying out the proposed transaction or from entering into or carrying out any other agreement, understanding, or plan by which ABI would acquire, be acquired by, or merge with SABMiller or MillerCoors;

3.      That the United States be awarded costs in this action; and

4.      That the United States have such other relief as the Court may deem just and proper.

Dated:  July 20, 2016

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:


SONIA K. PFAFFENROTH (D.C. Bar #467946)
Deputy Assistant Attorney General


JUAN A. ARTEAGA
Deputy Assistant Attorney General


PATRICIA A. BRINK
Director of Civil Enforcement


ERIC MAHR (D.C. Bar #459350)
Director of Litigation


PETER J. MUCCHETTI (D.C. Bar #463202)
Chief, Litigation I


MICHELLE R. SELTZER* (D.C. Bar #475482)
Assistant Chief, Litigation I

TRAVIS R. CHAPMAN
DAVID C. KELLY
JILL C. MAGUIRE (D.C. Bar #979595)
DAVID M. STOLTZFUS

U.S. Department of Justice, Antitrust Division
Litigation I Section
450 Fifth Street, NW, Suite 4100
Washington, DC 20530
Telephone: (202) 353-3865
Facsimile: (202) 307-5802
E-mail: michelle.seltzer@usdoj.gov

Attorneys for the United States

* Attorney of Record

## APPENDIX A

### RELEVANT GEOGRAPHIC MARKETS AND CONCENTRATION DATA

| Metropolitan Statistical Area | Combined Share | Post-Acquisition HHI | HHI Increase |
|---|---|---|---|
| Wichita, KS | 94% | 8904 | 4431 |
| Tulsa, OK | 90% | 8094 | 3477 |
| Green Bay, WI | 87% | 7551 | 3761 |
| Oklahoma City, OK | 83% | 6985 | 3013 |
| Peoria/Springfield | 80% | 6465 | 3148 |
| St. Louis, MO | 79% | 6268 | 2343 |
| Milwaukee, WI | 78% | 6105 | 2303 |
| Salt Lake City, UT | 77% | 6081 | 2828 |
| Denver, CO | 76% | 5916 | 2903 |
| Omaha, NE | 76% | 5796 | 2643 |
| Louisville, KY | 76% | 5791 | 2774 |
| Des Moines, IA | 75% | 5694 | 2614 |
| New Orleans/Mobile | 75% | 5646 | 2593 |
| Minneapolis/St Paul | 72% | 5506 | 2478 |
| Indianapolis, IN | 72% | 5296 | 2605 |
| Roanoke, VA | 72% | 5205 | 2454 |
| Birmingham/Montgom | 71% | 5115 | 2303 |
| Kansas City, KS | 70% | 5027 | 2328 |
| Memphis, TN | 69% | 4909 | 2085 |
| Cincinnati/Dayton | 69% | 4841 | 2350 |
| Tampa/St Petersburg | 69% | 4832 | 2091 |
| Knoxville | 68% | 4763 | 2237 |
| Spokane, WA | 68% | 4760 | 2316 |
| Toledo | 68% | 4699 | 2163 |
| Charlotte, NC | 67% | 4626 | 2200 |
| Phoenix/Tucson | 66% | 4624 | 2147 |
| Houston, TX | 66% | 4594 | 1910 |
| Richmond/Norfolk | 67% | 4580 | 2168 |
| Jacksonville, FL | 66% | 4513 | 1805 |
| Dallas/Ft. Worth | 65% | 4474 | 2113 |
| Raleigh/Greensboro | 66% | 4427 | 2018 |
| Orlando, FL | 65% | 4416 | 1898 |
| Grand Rapids, MI | 65% | 4326 | 2053 |
| Las Vegas | 63% | 4221 | 1948 |
| Chicago, IL | 63% | 4157 | 1838 |
| Nashville, TN | 64% | 4155 | 1958 |
| Boise, ID | 63% | 4150 | 1923 |
| Detroit, MI | 62% | 3995 | 1891 |
| Columbus, OH | 59% | 3611 | 1722 |
| Cleveland, OH | 59% | 3568 | 1722 |

| | | | |
|---|---|---|---|
| Hartford/Springfield | 57% | 3552 | 1442 |
| Albany, NY | 57% | 3528 | 1640 |
| Miami/Ft Lauderdale | 53% | 3367 | 1274 |
| Los Angeles, CA | 49% | 3261 | 1166 |
| Atlanta, GA | 55% | 3241 | 1506 |
| New York | 53% | 3190 | 1319 |
| Syracuse, NY | 54% | 3179 | 1400 |
| Portland, OR | 54% | 3042 | 1382 |
| Seattle/Tacoma | 51% | 2878 | 1323 |
| Boston, MA | 50% | 2836 | 1169 |
| Buffalo/Rochester | 50% | 2773 | 1207 |
| Sacramento, CA | 48% | 2715 | 1174 |
| San Diego, CA | 47% | 2594 | 1085 |
| Harrisburg/Scranton | 49% | 2582 | 1172 |
| Baltimore/Washington | 48% | 2513 | 1124 |
| San Fran/Oakland | 41% | 2251 | 820 |
| Pittsburgh, PA | 42% | 1960 | 835 |
| Philadelphia, PA | 37% | 1556 | 683 |

## APPENDIX B

### DEFINITION OF THE HERFINDAHL-HIRSCHMAN INDEX

"HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30 percent, 30 percent, 20 percent, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$). The HHI takes into account the relative size distribution of the firms in a market and approaches zero when a market consists of a large number of small firms. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is in excess of 2,500 are considered to be highly concentrated. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* ¶ 5.3 (revised Aug. 19, 2010), https://www.justice.gov/atr/horizontal-merger-guidelines-08192010. Transactions that increase the HHI by more than 200 points in highly concentrated markets presumptively raise antitrust concerns under the guidelines issued by the U.S. Department of Justice and Federal Trade Commission. *See id.*