# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

               Plaintiff,

               v.

ANHEUSER-BUSCH InBEV, and
SABMILLER plc,

               Defendants.

Civil Action No. 1:16-cv-01483 (EGS)

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS
25 Louisiana Ave., NW
Washington, D.C.  20001,

               Amicus Curiae.

## [PROPOSED] BRIEF OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS AS AMICUS CURIAE IN REPLY TO RESPONSE OF PLAINTIFF UNITED STATES TO PUBLIC COMMENTS ON THE PROPOSED FINAL JUDGMENT

ALLEN P. GRUNES
   *Counsel of Record*
D.C. Bar No. 989298
MAURICE E. STUCKE
D.C. Bar No. 1028778
THE KONKURRENZ GROUP
5335 Wisconsin Ave., NW, Suite 440
Washington, D.C. 20015
Tel. (202) 644-9760
Fax (202) 888-7522
allengrunes@konkurrenzgroup.com

*Counsel for Amicus Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

The International Brotherhood of Teamsters is not a corporation and no corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ………………………………………………… i

TABLE OF AUTHORITIES ……………………………………………………………….…iii

INTEREST OF AMICUS CURIAE ………………………………………………………...……1

INTRODUCTION ………………………………………………………………………….…1

ARGUMENT ……………………………………………………………………….…………7

    I.   The Tunney Act Requires Courts to Make an Independent, Objective, and Active
        Determination Without Undue Deference to the DOJ …………………………………...7

    II.  The DOJ Has Failed to Show How Its Behavioral Remedy Effectively Opens the
        Highly Concentrated Beer Markets to Competition and Prevents the Recurrence of
        Anticompetitive Activity That Has Plagued This Industry ………………….…..………10

    III. There is a Fundamental Disconnect between the Coordinated Effects Alleged by the
        Government and the Remedy …………………………………………………………11

    IV. Stand-Alone Behavioral Remedies are Generally Ineffective in Preventing Future
        Price Increases and are Strongly Disfavored ………………………………………13

    V.  DOJ's View of Competitive Harm from the Merger Requires a Structural Remedy……16

CONCLUSION …………………………………………………………………………….20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*California v. Am. Stores Co.*, 495 U.S. 271 (1990) ...................................................... 13

*Com. v. Partners Healthcare Sys., Inc.*, No. SUCV2014-02033-BLS2, 2015 WL 500995 (Mass. Super. Jan. 30, 2015) ............................................................................................. 14

*Pabst Brewing Company LLC v. MillerCoors LLC*, No. 2016-cv-002536 (Wisc. Cir. Ct., Milwaukee Cty. Mar. 30, 2016) ............................................................................... 18

*Hosp. Corp. of Am. v. Fed. Trade Comm'n*, 807 F.2d 1381 (7th Cir. 1986) ................................ 2

*ProMedica Health Sys., Inc. v. F.T.C.*, 749 F.3d 559 (6th Cir. 2014) ......................................... 14

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775 (9th Cir. 2015) ............................................................................................................. 13-14

*United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131 (D.D.C. 1982) (Greene, J.), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983) ................................................ 8, 9

*United States v. Anheuser-Busch InBev SA/NV and Grupo Modelo S.A.B. de C.V., No. 1:13-cv-00127 (D.D.C. Jan. 31, 2013)* ............................................................................. 3, 10

*United States v. Blavatnik*, No. CV 15-1631 (RDM), 2016 WL 593449 (D.D.C. Feb. 12, 2016) ...................................................................................................................... 8

*United States v. BNS, Inc.*, 858 F.2d 456 (9th Cir. 1988) ............................................................ 6

*United States v. Clear Channel Commc'ns, Inc.*, No. 1:00CV02063, 2001 WL 34038532 (D.D.C. Feb. 27, 2001) ............................................................................................. 15

*United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961)..............................13

*United States v. NewPage Holdings, Inc.*, 2015 WL 9982691 (D.D.C. Dec. 11, 2015) ............. 19

*United States v. Northrop Grumman Corp.*, No. CIV.1:02CV02432, 2003 WL 21659404 (D.D.C. June 10, 2003) ....................................................................................................... 15

*United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157 (D.D.C. 2010), *judgment entered*, No. CIV.A. 08-2076, 2010 WL 3245395 (D.D.C. July 15, 2010) .................................. 14

**Statutes**

Antitrust Procedures and Penalties Act (Tunney Act), 15 U.S.C. § 16 .................................. 1, 8, 9

**Other Authorities**

150 Cong. Rec. S3615 (Apr. 2, 2004).............................................................................................. 7

150 Cong. Rec. S3617 (Apr. 2, 2004)......................................................................................... 7, 8

Joanna Fantozzi, *Your Avocados and Beer Will Be Taxed 20 Percent if Trump's Mexico Tariff Goes Through,* The Daily Meal (Jan. 27, 2017) ....................................................... 16

Fed. Trade Comm'n and U.S. Dep't of Justice, *Horizontal Merger Guidelines* (2010) ............... 2

*Federal Trade Commission Bureau of Competition Staff Submission to the West Virginia Health Care Authority Regarding Cooperative Agreement Application of Cabell Huntington Hospital Pursuant to W. Va. Code §§ 16-29B-26, 28-29,* dated April 18, 2016, 2016 WL 1638110..... 14

John J. Flynn and Darren Bush, *The Misuse and Abuse of the Tunney Act: The Adverse Consequences of the "Microsoft Fallacies,"* 34 Loyola U. Chicago L. J. 749, 758 (2003)....... 7

John E. Kwoka, Jr., *Does Merger Control Work? A Retrospective on U.S. Enforcement Actions and Merger Outcomes*, 78 Antitrust L.J. 619, 636, 641 (2013)................................................ 14

Tara Nurin, *It's Final: AB InBev Closes On Deal To Buy SABMiller*, Forbes (October 10, 2016) ........................................................................................................................................5-6

Tripp Mickle, *Trouble Brewing in the Craft Beer Industry*, Wall Street Journal (Sept. 27, 2016) ...................................................................................................................................... 15-16

Tripp Mickle and Laurence Norman, *AB InBev Warns of Thousands of Merger-Related Job Losses*, Wall Street Journal (Aug. 26, 2016) .......................................................................... 17

## INTEREST OF AMICUS CURIAE

The International Brotherhood of Teamsters ("IBT" or "Teamsters") represents the interests of approximately 1.4 million members under 21 Industrial Divisions.  IBT's Brewery & Soft Drink Conference represents approximately 15,000 members working in the U.S. beer industry, including brewery workers at Anheuser-Busch and MillerCoors breweries, workers employed in beer distribution, and workers at canning and bottling facilities.

IBT submitted Comments pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16 ("APPA" or "Tunney Act"), outlining certain deficiencies in the Proposed Final Judgment.  It submits this amicus brief to reply to the Response of Plaintiff United States to Public Comments on the Proposed Final Judgment ("Response").

## INTRODUCTION

Since 2009, the U.S. beer industry has been dominated by two giants:  Anheuser-Busch InBev ("Anheuser-Busch" or "ABI") and MillerCoors.[1]  As a result, as the DOJ alleges in its Complaint, the beer market today remains "highly concentrated" with these two companies controlling approximately 72% of the market – far more than any other brewer.  *See* Complaint (doc. 1) ¶ 39.  In addition, the U.S. beer industry is characterized by high barriers to entry by new firms and high barriers to expansion by smaller brewers already in the market.  *Id*. at ¶ 48.

Antitrust law and economics teach that when an industry is highly concentrated, has high entry barriers, and has certain other conditions (for example, when each competitively important firm's significant competitive initiatives can be promptly and confidently observed by its rivals), tacit collusion may arise.  Tacit collusion – also referred to "tacit coordination" or "coordinated

---

[1] In 2008, SABMiller and Molson Coors combined their U.S. assets into the MillerCoors joint venture.  In 2009, InBev acquired Anheuser-Busch.

interaction" – involves a profitable strategy for the few large firms in the industry to coordinate on pricing, output or other competitive dimensions and to accommodate each other rather than to aggressively compete on the merits.  In many ways, this accords with common sense and experience.  With only a few "big dogs" in an industry, there can be a strong incentive to "get along" rather than "go it alone."

It is well-accepted that mergers can enable or encourage tacit collusion.  Section 7 of the 2010 FTC and DOJ Horizontal Merger Guidelines ("Coordinated Effects") explains:

> A merger may diminish competition by enabling or encouraging post-merger coordinated interaction among firms in the relevant market that harms customers. Coordinated interaction involves conduct by multiple firms that is profitable for each of them only as a result of the accommodating reactions of the others. These reactions can blunt a firm's incentive to offer customers better deals by undercutting the extent to which such a move would win business away from rivals. They also can enhance a firm's incentive to raise prices, by assuaging the fear that such a move would lose customers to rivals.[2]

Coordinated effects resulting from a merger are a central concern of antitrust law.  Judge Richard Posner has written that the "ultimate issue" in reviewing a merger under the antitrust laws is "whether the challenged acquisition is likely to hurt consumers, as by making it easier for the firms in a market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level."  *Hosp. Corp. of Am. v. Fed. Trade Comm'n*, 807 F.2d 1381, 1386 (7th Cir. 1986).[3]

Tacit collusion is a real, not merely hypothetical, competitive problem in the U.S. beer industry.  According to DOJ's 2013 complaint in the ABI/Modelo transaction, Anheuser-Busch

---

[2] Fed. Trade Comm'n and U.S. Dep't of Justice, *Horizontal Merger Guidelines* § 7 (2010), https://www.justice.gov/atr/horizontal-merger-guidelines-08192010.

[3] Unlike express collusion (where companies agree to fix prices), tacit collusion is generally beyond the reach of the Sherman Act. This means that merger enforcement and effective remedies are particularly important when mergers increase the risk of tacit collusion.

and MillerCoors have been engaged for years in strategic coordinated pricing:  Anheuser-Busch

makes its pricing strategy very visible, and when it raises its prices, MillerCoors often follows

suit.  *See* Complaint, United States v. Anheuser-Busch InBev SA/NV and Grupo Modelo S.A.B.

de C.V., No. 1:13-cv- 00127 (D.D.C. Jan. 31, 2013) at ¶¶ 44-47,

https://www.justice.gov/atr/case-document/file/486606/download (hereinafter "Modelo

Complaint"); Competitive Impact Statement, United States v. Anheuser-Busch InBev SA/NV

and Grupo Modelo S.A.B. de C.V., No. 1:13-cv- 00127 (D.D.C. Jan. 31, 2013) at 7,

https://www.justice.gov/atr/case-document/file/486551/download (hereinafter "Modelo

Competitive Impact Statement") ("The United States determined through its investigation that

large brewers engage in significant levels of tacit coordination and that coordination has reduced

competition and increased prices.").  In its Modelo Complaint, the DOJ alleged that ABI's

acquisition of 100% of Modelo would have made the problem of tacit coordination worse.

Modelo Complaint at ¶ 47.  For this reason, DOJ insisted on the divestiture of a significant

brewery.  DOJ's theory was that putting a large brewery in the hands of an independent

competitor would help disrupt the tacit coordination between ABI and MillerCoors as the buyer

would have an incentive to "resist ABI's price leadership" and to compete aggressively for

market share.  *See* Modelo Competitive Impact Statement at 10.

    Although the divestiture ordered in *Modelo* appears to have been partially successful,

tacit coordination in the beer industry remains a significant concern to the DOJ.  Nowhere in any

of its filings does the government state or suggest that tacit coordination between Anheuser-

Busch and MillerCoors has ceased or abated.  In fact, the contrary is true.  DOJ has reiterated in

its filings with this Court that coordination between the two industry giants remains a

competitive problem.  *See* Complaint ¶¶ 21-22 (noting that for "many years" Anheuser-Busch

has sought to establish industry-wide prices and MillerCoors has followed ABI's price increases "to a significant degree").  DOJ affirmatively states that the acquisition of SABMiller by ABI would lead to greater coordination.  *See* Competitive Impact Statement (doc. 3) at 7-8 (noting that as a result of the ABI/SABMiller transaction, "ABI and MillerCoors would be able to coordinate their competitive behavior, possibly to the extent where they behaved as a single, profit-maximizing entity").  Moreover, DOJ affirmatively states that the divestiture of SABMiller's ownership interest in MillerCoors – the only structural remedy obtained by DOJ in this case – will actually *increase* the risk of coordination between Anheuser-Busch and MillerCoors.  *See* Competitive Impact Statement at 12; Response (doc. 16) at 11-12 (noting that after Molson Coors acquires full control of MillerCoors, there is increased risk that ABI and MillerCoors "could be more accommodating to each other in the United States").  These conclusions from the DOJ investigation are in the record before the Court.

DOJ has reached an additional conclusion that is relevant here.  It alleges that competition from "high-end" beer (defined to mean craft beers and imported beers) "serves as an important constraint" on additional price increases by Anheuser-Busch and MillerCoors, whether those price increases are unilateral or coordinated.  Complaint at ¶¶ 19, 23.  The behavioral remedy in DOJ's Proposed Final Judgment is intended to preserve this alleged "constraint," chiefly by imposing certain restrictions on ABI's distribution practices and ownership of distributors with the goal of preventing ABI from exercising power to limit the distribution of craft beers.  *See* Response at 7.

The question presented is this:  Do the behavioral conditions that DOJ has imposed on Anheuser-Busch's distribution practices and ownership of distributors adequately (or at all) remedy the heightened risk of coordinated interaction between Anheuser-Bush and MillerCoors

resulting from the merger and divestiture transaction?  If the Court is not convinced, after giving appropriate deference to the government, that the remedy adequately addresses this fundamental, merger-related competitive problem, then the settlement should be modified to bring it within the public interest standard.

For four reasons, the settlement does not pass muster and should not be approved.  First, DOJ seeks to have the Court apply an overly deferential standard.  Under the proper standard, DOJ is required to show that the remedy will open the market to competition and prevent the recurrence of the anticompetitive conduct alleged.  It has not met this legal standard.  Second, there is a lack of connection – a basic disconnect – between the theory of harm in the Complaint and the behavioral remedy in the Proposed Final Judgment.  Specifically, DOJ's remedy does nothing to curtail, prevent, or reduce the risk of further coordination between Anheuser-Busch and MillerCoors.  All it does is protect a perceived cap on pricing by regulating the interaction between Anheuser-Busch and distributors.  Third, the remedy itself is flawed.  Behavioral remedies are viewed by DOJ, courts and economists to be far less effective than structural remedies (i.e., divestitures), and virtually never effective in horizontal mergers such as this one. Accordingly, behavioral remedies are used sparingly and in circumstances not applicable here. Finally, DOJ had the option to insist on a structural remedy – the divestiture of a large brewery in Eden, North Carolina – that could open the market to competition and undermine the ongoing tacit collusion.  DOJ never explains why it deviated from its preferred remedy, and its attempt to distinguish *Modelo* (where it insisted on divestiture of a brewery) from this case (where it does not) is unpersuasive.

Before we get into the specifics, we raise one important point.  The merger and divestiture transactions closed months ago, in October 2016.  See Tara Nurin, *It's Final: AB*

*InBev Closes On Deal To Buy SABMiller*, FORBES (October 10, 2016), *available at*

http://www.forbes.com/sites/taranurin/2016/10/10/its-final-ab-inbev-closes-on-deal-to-buy-

sabmiller.  SABMiller has been absorbed into ABI, and Molson Coors is now full owner of

MillerCoors.  This Court reasonably may be concerned that it has no power to take any action

other than to approve the settlement, or at most require minor modifications or tweaks to the

behavioral conditions.  That is emphatically not the case.  DOJ and the courts have long taken

the position that parties consummate their mergers at their own risk if they do so before the

district court enters final judgment under the Tunney Act.  The parties have stipulated that the

government is free to withdraw its consent at any time before the Court enters judgment.  *See*

Hold Separate Stipulation and Order (doc. 9) at 9.  That means the government's approval of a

consent decree is not a blanket authorization for the parties to complete the transaction.

Although it is exceedingly rare for the government to exercise this option, it is nonetheless a

standard feature of merger consent decrees and important because it preserves the government's

power to revoke its consent.  Moreover, as the Ninth Circuit has explained,

> By expanding a district court's authority over consent decrees through the independent
> review provisions of the APPA, Congress necessarily intended that the court have the
> power to make its review effective.  We believe that the review process in merger cases
> would be undermined if courts were unable to maintain the status quo while determining
> whether a proposed consent decree is in the public interest. That very interest could be
> harmed irreparably by permitting a merger to become a fait accompli while the court
> awaited public comments and performed its APPA review function. For example, if after
> review of public comments a court were to disapprove a proposed consent decree because
> of the possibility of a substantial lessening of competition, and the government were to
> reconsider its position in view of the court's decision, harm from the interim restraints of
> trade could be irreparable.

*United States v. BNS, Inc.*, 858 F.2d 456, 461-62 (9th Cir. 1988).

The Court is not obliged to become a "rubber stamp" merely because DOJ and the parties

have gone ahead without its blessing.

## **ARGUMENT**

**I.      The Tunney Act Requires Courts to Make an Independent, Objective, and Active Determination Without Undue Deference to the DOJ.**

The DOJ in its Competitive Impact Statement relied on boilerplate language for the standard of review under the Tunney Act.  Competitive Impact Statement, at 29-33.  Its aim was to impress upon commenters and the Court that the inquiry is "necessarily limited" and that the government is entitled to "broad discretion."  Although the DOJ never used the term, it essentially asked this Court to rubber stamp its consent decree.

The language of the Tunney Act and its legislative history contradict the government's argument for a sharply proscribed, highly deferential review.  The Teamsters discussed at length why the Government's proposed standard is contrary to the Tunney Act, the 2004 Amendments to the Act, and the Act's legislative history.  *See* Teamsters Comments (doc. 16-12) at 2-10.

Rather than respond to the Teamsters' extensive comments, the DOJ's Response largely repeats the boilerplate from the Competitive Impact Statement.  *See* Response at 2-5.  The DOJ repeats the pre-2004 case law, which Congress, in amending the Tunney Act, criticized as "contrary to the intent of the Tunney Act and effectively strips the courts of the ability to engage in meaningful review of antitrust settlements."  150 Cong. Rec. S3615 (Apr. 2, 2004).  The DOJ ignores how Congress "wanted the courts to make an independent, objective, and active determination" without undue deference to DOJ.  150 Cong. Rec. S3617 (Apr. 2, 2004) (quoting John J. Flynn and Darren Bush, *The Misuse and Abuse of the Tunney Act: The Adverse Consequences of the "Microsoft Fallacies*," 34 Loyola U. Chicago L. J. 749, 758 (2003)).  And the DOJ never explains how its proposed highly deferential, significantly proscribed review squares with the Act itself.

If Congress intended to proscribe the Court's power under the Tunney Act, it would have done so.  Instead, in enacting and amending the Tunney Act, Congress expressed two principal concerns: the excessive secrecy of the consent decree process and the DOJ's failure to provide appropriate relief.  *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 148 (D.D.C. 1982) (Greene, J.), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *United States v. Blavatnik*, No. CV 15-1631 (RDM), 2016 WL 593449, at *7 (D.D.C. Feb. 12, 2016) (recognizing that "Congress was spurred to act by its perception that the Justice Department had repeatedly settled antitrust cases for injunctive decrees that were less demanding than Congress believed appropriate").

To ensure that a consent decree is in in the public interest, Congress gave the district court broad power.  This Court, on its own motion, can take testimony of government officials or experts or any other expert witness (as this Court may deem appropriate); obtain the views, evaluations, or advice of any individual, group or governmental agency with respect to any aspects of the proposed judgment or the effect of such judgment; or take any other action in the public interest as this Court may deem appropriate.  15 U.S.C. § 16(f).

No one disputes that the federal courts should give some deference to the government's decisions underlying a consent decree.  The question is how much.  In the leading case, *United States v. Am. Tel. & Tel. Co.*, Judge Greene sought a balance.  Senator Kohl in amending the Tunney Act specifically endorsed Judge Greene's standard in *AT&T.*  150 Cong. Rec. S3617 (Apr. 2, 2004).  On the one hand, in evaluating a settlement, a court cannot freely exercise its discretion to fashion a remedy as it would if there was a full trial and a finding of liability.  The Tunney Act does not require that DOJ obtain the best of all possible remedies, and it does not give a court discretion to insist on the remedy that it might have imposed after a full trial on the

merits.  On the other hand, the court does not have to "unquestioningly accept a proffered decree

as long as it somehow, and however inadequately, deals with the antitrust and other public policy

problems implicated in the lawsuit. To do so would be to revert to the 'rubber stamp' role which

was at the crux of the congressional concerns when the Tunney Act became law." *AT&T*, 552 F.

Supp. at 151.  Thus, the proper standard of review in assessing whether the consent decree is in

the public interest is the following:

> If the decree meets the requirements for an antitrust remedy—that is, if it *effectively*
> *opens* the relevant markets to competition and *prevents the recurrence of anticompetitive*
> *activity*, all without imposing undue and unnecessary burdens upon other aspects of the
> public interest—it will be approved.  If the proposed decree does not meet this standard,
> the Court will follow the practice applied in other Tunney Act cases and, as a prerequisite
> to its approval, it will require modifications which would bring the decree within the
> public interest standard as herein defined.

*AT&T*, 552 F. Supp. at 153 (emphasis added).

Accordingly, the Court is not obligated to accept the DOJ's legally flawed boilerplate.  It

is contrary to the purpose (and language) of the Tunney Act.  The legislative history, as the

Teamsters' Comments examine in detail, contradicts the government's argument for a sharply

proscribed, highly deferential review.  The DOJ could have responded to the Teamsters'

Comments on the appropriate standard of review.  It chose not to do so.  *See* 15 U.S.C. § 16(d)

("At the close of the period during which such comments may be received, the United States

shall file with the district court and cause to be published in the Federal Register a response to

such comments.").  The Court should apply the *AT&T* standard, which the legislative history to

the 2004 Tunney Act Amendments endorsed.

**II.     The DOJ Has Failed to Show How Its Behavioral Remedy Effectively Opens the Highly Concentrated Beer Markets to Competition and Prevents the Recurrence of Anticompetitive Activity That Has Plagued This Industry.**

Particularly relevant here is the fact that the DOJ is not writing on a blank slate.  As the DOJ notes in its Competitive Impact Statement, the district court is statutorily "required" – not merely permitted – to take into account "competitive considerations bearing upon the adequacy" of the proposed settlement by the Tunney Act.  Competitive Impact Statement at 29.  In this case, those "competitive considerations" include DOJ's past and present statements about competition in the beer industry, its past enforcement decisions in beer mergers, its own statements of enforcement policy, and independent economic analysis of the competitive effects arising from past beer mergers.

Competitive considerations are particularly relevant here.  As the DOJ alleged in its 2013 Modelo Complaint, the beer market is highly concentrated, has high entry barriers, and is subject to tacit collusion between the two largest brewers, Anheuser-Busch and MillerCoors.  The DOJ's conclusion about coordinated effects in the beer industry was later supported by a sophisticated empirical study conducted by two economists, Nathan Miller and Matthew Weinberg. (*See* Teamsters' Comments at 13-14.)  The Teamsters offered additional evidence that Anheuser-Busch's and MillerCoors' beer prices are continuing to trend upward.  (*See* Teamsters' Comments at 14-16.)  Finally, looking at the Government's allegations in the Complaint here, the beer market, both nationally and in many local areas, appears to be as concentrated in 2016 as it was in 2013, if not more so.  (Teamsters' Comments at 17.)

The Teamsters Comments noted that DOJ had only three possible responses to this glaring problem.  It could claim: (1) that price coordination between ABI and MillerCoors has in fact ceased; (2) that the merger does not make coordination any worse because SABMiller is

divesting its stake in MillerCoors; or (3) that the behavioral remedies on distribution in the Proposed Final Judgment are adequate and effective in preventing coordinated pricing between ABI and MillerCoors.  (Teamsters' Comments at 19.)

The DOJ in its Response does not argue (1) or (2).  Indeed, it repeats the conclusion in its Competitive Impact Statement that the divestiture of SABMiller's stake in MillerCoors will not solve the problem, but actually may facilitate such coordination. (DOJ Response at 11-12.)  As the next section shows, it does not even argue (3).

Under the applicable legal standard, the burden is on DOJ to convince the Court that its remedy will open the beer market to competition and prevent the recurrence of tacit collusion. We respectfully submit that it has failed to meet its burden.

### III.    There is a Fundamental Disconnect between the Coordinated Effects Alleged by the Government and the Remedy.

DOJ asserts that the Proposed Final Judgment accomplishes the following:

- preventing ABI from increasing its market share in the U.S. and further concentrating the U.S. beer industry through its acquisition of SABMiller;
- preserving head-to-head competition between ABI and its largest U.S. competitor, MillerCoors;
- granting MillerCoors ownership rights of Miller beer brands and perpetual, royalty-free licenses to products for which it previously paid royalties;
- placing certain restrictions on ABI's distribution practices and ownership of distributors; and
- requiring ABI to provide the United States with notice of future acquisitions, including non-reportable acquisitions of beer distributors and craft brewers, prior to their consummation.

Response at 12-13.

Points 1, 2, 3 and 5 are irrelevant to remedying the problem of tacit collusion/interdependent pricing.  Selling SABMiller's stake to Molson Coors, as the government noted, actually makes the problem worse.  Preserving head-to-head competition between Anheuser-Busch and MillerCoors does nothing to remedy the problem, if those two

companies continue to coordinate their pricing.  Granting MillerCoors worldwide rights to the Miller brand has no impact in the U.S., where MillerCoors already owns the rights.  And requiring ABI to provide DOJ with future notice of small distributor and craft brewer acquisitions (below the Hart-Scott-Rodino Act threshold of $82.2 million in 2017) does nothing to eliminate or lower the risk of coordination between the two giants.

The only remedy advanced by the DOJ that might in theory come into play is point 4, placing behavioral restrictions on ABI's distribution and ownership of distributors.  We say "in theory," as there is nothing – no argument, no evidence, no citation, and no other indication – that explains how or why placing behavioral limits on what ABI can do with its owned or independent distributors will cause price coordination between Anheuser-Busch and MillerCoors to cease or prevent its recurrence.  At most, according to the DOJ, the behavioral conditions will help limit future price increases by these companies.

The basic theory seems to be this:  Anheuser-Busch and MillerCoors have been tacitly colluding and that is why consumers have been paying too much for many kinds of beer.  As the two companies continue to raise their prices, eventually the prices of their beers will bump into the prices of (unidentified) "high-end" beers.  When that happens, the high-end beers will act as a "constraint" or limit on further price increases by Anheuser-Busch and MillerCoors, whether acting alone or in coordination.  That is because, according to the DOJ, the two giants want to preserve a "gap" in the pricing between different categories of beer.  The behavioral remedy is intended to preserve the role of "high-end" beers as an alleged constraint, primarily by seeking to insure that Anheuser-Busch (though not MillerCoors) cannot interfere in certain ways with the distribution of these "high-end" beers.

This theory is a far cry from any sort of explanation as to how or why the behavioral limits on distribution will prevent the two industry giants from continuing to accommodate each other, or from coordinating their conduct in the future.  There is simply no basis in the record for the Court to conclude that DOJ has established any nexus between the coordinated effects it claims and the conduct remedy it proposes.  This lack of nexus between competitive harm and remedy is a fatal flaw under any version of the public interest standard, including the overly deferential one put forward by DOJ.

## IV.   Stand-Alone Behavioral Remedies are Generally Ineffective in Preventing Future Price Increases and are Strongly Disfavored.

Merger remedies generally take two forms: one addresses the structure of the market (structural remedies), the other the conduct of the merged firm (behavioral or conduct remedies). Structural remedies generally involve the sale of physical assets by the merging firms. Conduct remedies, on the other hand, usually entail injunctive provisions that would, in effect, manage or regulate the merged firm's post-merger business conduct.

Here the DOJ relies on behavioral, rather than structural, remedies, such as the divestiture of a brewery.  This by itself is highly unusual.

Congress, courts, antitrust enforcers, and economists are highly skeptical of conduct restrictions and strongly prefer structural remedies such as divestiture or enjoining a merger entirely.  Congress "made express its view that divestiture was the most suitable remedy in a suit for relief from a § 7 violation."  *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990).  The Supreme Court has long held that structural remedies are the "natural remedy" for unlawful mergers and acquisitions, because they are "simple, relatively easy to administer, and sure." *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 329-31 (1961); *see also Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 792 (9th Cir.

2015) ("The customary form of relief in § 7 cases is divestiture"); *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010), *judgment entered*, No. CIV.A. 08-2076, 2010 WL 3245395 (D.D.C. July 15, 2010) (in its settlements, DOJ has consistently favored structural remedies, such as divestitures, over conduct remedies, which require "continued government interference in a particular market"); John E. Kwoka, Jr., *Does Merger Control Work? A Retrospective on U.S. Enforcement Actions and Merger Outcomes*, 78 Antitrust L.J. 619, 636, 641 (2013) (noting that behavioral remedies typically require post-merger monitoring and administration, are often viewed as less effective than divestitures, and, based on an empirical analysis of post-merger retrospectives, are substantially less effective than structural remedies, with post-merger price increases twice as large as in the case of divestitures).

Conduct remedies are disfavored because they generally do not restore competition or remedy the competitive harm. *See ProMedica Health Sys., Inc. v. F.T.C.*, 749 F.3d 559, 573 (6th Cir. 2014) (noting that conduct remedies are disfavored because "there are usually greater long term costs associated with monitoring the efficacy of a conduct remedy than with imposing a structural solution"). As the FTC recently noted, behavioral remedies "attempt to merely mitigate the harm for a limited period of time." *Federal Trade Commission Bureau of Competition Staff Submission to the West Virginia Health Care Authority Regarding Cooperative Agreement Application of Cabell Huntington Hospital Pursuant to W. Va. Code §§ 16-29B-26, 28-29*, dated April 18, 2016, 2016 WL 1638110, at *31 ("so-called 'conduct-based' remedies" are "temporary and limited in scope—like putting a band-aid on a gaping wound that will only continue to bleed (perhaps even more profusely) once the band-aid is taken off." *Id.* (quoting *Com. v. Partners Healthcare Sys., Inc.*, No. SUCV2014-02033-BLS2, 2015 WL 500995 (Mass. Super. Jan. 30, 2015)).

14

Finally, in an analogous context, the DOJ has warned of the shortcomings of remedies other than divestiture:

> As a general matter, the Antitrust Division does not believe that decree restrictions dealing with corporate governance arrangements are an appropriate remedy for the anticompetitive effects that might arise from mergers and acquisitions. Such restrictions will have only limited efficacy as long-term protections against anticompetitive effects, and may require ongoing oversight of the conduct of a corporation's internal affairs that neither the Antitrust Division nor a Court is well-suited to perform.

*United States v. Clear Channel Commc'ns, Inc.*, No. 1:00CV02063, 2001 WL 34038532, at *18 (D.D.C. Feb. 27, 2001).  Consequently, the DOJ relies on behavioral remedies only in "unique circumstances," such as vertical mergers, where the combination offers substantial efficiencies that could not be obtained if structural relief were imposed.  *United States v. Northrop Grumman Corp.*, No. CIV.1:02CV02432, 2003 WL 21659404, at *17 (D.D.C. June 10, 2003).  The DOJ never alleged here any substantial efficiencies that would necessitate the unusual need of a behavioral remedy.  Nor does the DOJ explain why it is foregoing the relatively clean and certain structural remedy, such as divesture of a brewery, and instead is seeking to incur the costs and uncertainty of government entanglement in the market.

The conduct remedy here is unlikely to be effective in preventing future price increases. As the Teamsters pointed out in their Comments, both ABI and MillerCoors continue to acquire craft beers.  The remaining craft brewers are by definition so small as to be only fringe players in the market – fringe players, moreover, that (according to DOJ) cannot rapidly increase their production in response to a price increase by ABI or MillerCoors because of high barriers to entry and expansion.  Moreover, craft brewers and imports face obstacles not faced by the industry giants.  The *Wall Street Journal* reported that the proliferation of small breweries has left owners struggling to find enough specialty hops, and this has contributed to a drop in craft

sales in 2016.[4]  More recently, there has been a threat by the current administration to impose a 20% tariff on imports from Mexico, "which would cause the prices of . . . Mexican beer . . . to skyrocket."[5]  All that is required is a few exogenous shocks or changes in the industry like these for the remedy to fail.

**V.      DOJ's View of Competitive Harm from the Merger Requires a Structural Remedy.**

Here, as in *Modelo*, a structural remedy is both necessary and appropriate.  Structural relief is the only way to open the beer market to competition and to remedy the increased risk of tacit collusion between Anheuser-Busch and MillerCoors.  Although the Court cannot order the parties to agree to the divestiture of a brewery, on the present record it should refuse to enter the Proposed Final Judgment in the absence of structural relief.

A structural remedy is readily available, namely the divestiture of the MillerCoors brewery in Eden, North Carolina[6] or another comparably significant brewery.  Unlike the government's behavioral remedy, the divestiture of a brewery to a qualified buyer would be clean and certain, and avoid costly government entanglement in the market.  There are no direct costs associated with monitoring the merged firm's activities and ensuring adherence to the decree.  Plus placing a large and efficient U.S. brewery in a competitor's hand would immediately inject much needed competition into this industry.

---

[4] Tripp Mickle, *Trouble Brewing in the Craft Beer Industry*, Wall Street Journal (Sept. 27, 2016), available at http://www.wsj.com/articles/trouble-brewing-in-the-craft-beer-industry-1474990945.

[5] Joanna Fantozzi, *Your Avocados and Beer Will Be Taxed 20 Percent if Trump's Mexico Tariff Goes Through*, The Daily Meal (Jan. 27, 2017), available at http://www.thedailymeal.com/news/eat/your-avocados-and-beer-will-be-taxed-20-percent-if-trump-s-mexico-tariff-goes-through/012717.

[6] The brewery was closed in September, 2016, after the United States filed its Complaint.  On information and belief, the brewery has not been dismantled and may be restarted in new hands. It is capable of being restarted by an independent brewer.  *See* discussion *infra*.

In its Response, the DOJ makes two arguments.  First, it states that it "did not uncover evidence suggesting that MillerCoors' decision to close the Eden brewery was related to ABI's proposed acquisition of SABMiller."  Response at 34.  Second, it seeks to distinguish the structural remedy obtained in *Modelo* from this case.  *Id*. at 34-35.

With respect to the first argument, and without questioning the adequacy of the DOJ investigation, we offer a few observations.  First, the DOJ does not dispute any of the facts in the Teamsters Comments, all of which are well-documented.  Second, as is now apparent, the decision to close the Eden brewery was made after ABI initially approached members of the SABMiller board about a possible transaction.  This fact was only disclosed in a securities filing after DOJ concluded its investigation.[7]  Third, there is more than a little circumstantial evidence that the closure of the brewery was anticompetitive, and the North Carolina Department of Justice has made a comment that supports this conclusion.  *See* Comments of North Carolina Department of Justice (doc 16-9) at 3 ("we can say generally that the information reviewed to date confirms our concerns that anticompetitive motives may have played a part regarding the closure of the Eden brewery and the accompanying lack of meaningful effort to sell it").[8]

---

[7] Tripp Mickle and Laurence Norman, *AB InBev Warns of Thousands of Merger-Related Job Losses*, Wall Street Journal (Aug. 26, 2016), http://www.wsj.com/articles/abinbev-warns-of-thousands-of-merger-related-job-losses-1472202321 ("Friday's filings also disclose for the first time that AB InBev approached some SAB Miller board members about a combination much earlier than previously thought—about 10 months before news of it broke. In December 2014, one of the Belgian brewer's major shareholders—who wasn't identified—approached representatives of the Santo Domingo family, which owns roughly 14% of SABMiller, about a merger. An AB InBev representative later broached the possibility with Altria Group Inc., the tobacco company that has an approximately 27% stake in SABMiller.

After months of talks, AB InBev shared a nonbinding term sheet with Altria and the Santo Domingos in August 2015, setting in motion a deal that would combine the world's two largest brewers. They announced their agreement on Nov. 11, 2015.).

[8] It should be noted that North Carolina has taken depositions as part of its investigation. *Id*.  By contrast, although the United States avers that it "took numerous party depositions" in its investigation (Response at 6), it apparently did not take any testimony under oath with respect to

Fourth, MillerCoors brewed Pabst beer under contract at the Eden brewery.  In a suit filed

against MillerCoors in March 2016 for breach of contract, Pabst alleged that it (Pabst) had

offered to buy or lease the brewery after the decision to close but was rebuffed by MillerCoors,

allegedly for anticompetitive reasons.  The Pabst complaint alleges:

> 6.    In September 2015—also during the parties' extension negotiations, and around the same time that MillerCoors announced its capacity-reducing plan to close the Eden Facility—MillerCoors informed Pabst that it will lack sufficient production capacity to continue performing its obligations to Pabst under the Agreement. The Agreement requires the parties to discuss—in good faith—potential solutions to any purported capacity constraints, in order to enable Pabst to exercise its option to extend the Agreement through the First Extension Term.

> 7.    Notwithstanding this requirement, after dropping its capacity-reduction bombshell on Pabst, MillerCoors refused to provide any information to substantiate its supposed capacity determination despite Pabst's repeated requests. MillerCoors also refused to entertain Pabst's offer to lease the Eden Facility in order to keep it open and continue production of Pabst's products, and was only willing to sell the Eden Facility to Pabst at an astronomical, non-market price.

Complaint, *Pabst Brewing Company LLC v. MillerCoors LLC*, No. 2016-cv-002536 (Wisc. Cir.

Ct., Milwaukee Cty. Mar. 30, 2016) (Copy attached as Exhibit 1).  Finally, as a matter of

antitrust enforcement, DOJ did not need to find that the decision to close the brewery was driven

by the merger in order to require that the brewery be divested.  DOJ only needed to find that such

a divestiture was necessary to address the competitive effects that it *did* find.

The government next attempts to distinguish the remedy in *Modelo*.  But its argument

actually supports the Teamsters.  DOJ states that it required the divestiture of a large brewery in

Mexico because the buyer (Constellation Brands) needed to produce all Modelo-branded beer in

Mexico but did not have its own Mexican brewery.  Response at 34.  With the prospect of tariffs

looming for imports from Mexico that could drive Constellation's prices up by 20%,

---

the circumstances surrounding the closure of the Eden brewery (Response at 33) (stating only
that the United States "obtained and reviewed documents" on the topic).

Constellation will no longer be an effective competitor merely because it has a large Mexican brewery.  Although the current administration's trade policies could not be foreseen in 2013, it is apparent that entry barriers for foreign brewers, including Constellation, may well become higher.  This will solidify, not threaten, the Anheuser-Busch and MillerCoors duopoly in the United States.  And it underscores the importance of a divestiture remedy in this, the largest beer merger in history.

In reply, DOJ may cite *United States v. NewPage Holdings, Inc.*, 2015 WL 9982691 (D.D.C. Dec. 11, 2015) as a relevant Tunney Act decision in which a court in this district refused to order an additional divestiture at the request of a union.  That case arose from a horizontal transaction involving the two largest manufacturers of coated and label paper.  In that case, DOJ had secured the divestiture of two mills as a remedy for the anticompetitive effects of the acquisition, but the union argued that a recently closed paper mill should also have been ordered divested to a buyer that would keep it operational.  In rejecting the union's argument, the court noted that the closed mill had been operating at a loss for several years and was "simply one of many closures in a declining industry."  The only party interested in buying the mill wanted it for scrap.  In other words, the closed mill was not profitable, was not going to become profitable, and had no competitive significance or value as a divestiture.  Divestiture buyers do not want to acquire assets that are losing money; to do so would in fact weaken the buyer as a competitor and not strengthen it.  There was also no evidence that the decision to close the mill was made out of the ordinary course of business.

The distinction between that case and this one is stark.  MillerCoors' Eden brewery was, until its closure in September, 2016, efficient, profitable and modern.  At all relevant times, the Eden brewery was one of the larger breweries in the MillerCoors system, with 8.8 million barrels

per year capacity and 10 production lines.  It was responsible for 12.5% of MillerCoors' brewing capacity and approximately 4% of all beer brewed in the U.S.  The brewery was efficient. MillerCoors' CEO acknowledged in a letter to IBT in 2016 that "Eden is an efficient brewery and . . . a very strong performing brewery, winning [the MillerCoors award for] 'Brewery of the Year' in 2010, 2011 and 2012."  The brewery consistently outperformed other MillerCoors' breweries under various metrics including machine efficiency, whole plant operating efficiency, capacity utilization, water-to-beer ratio, and estimated cost per barrel.  The brewery was also profitable.  In other words, the Eden brewery was a competitively significant asset, with value to a prospective acquirer.

The Eden brewery was closed in September 2016, after the United States filed its Complaint.  On information and belief, the brewery has not been dismantled.  It is capable of being restarted by an independent brewer.  Just as parties complete a merger during the Tunney Act review period at their own risk, so too do they take a risk by closing a significant and saleable asset during the Tunney Act review period.  Any other result would make a mockery of the judicial function.

## CONCLUSION

The divestiture of Eden or another large and efficient brewery (in the event that MillerCoors has taken steps to make the Eden divestiture impossible) would accomplish at least two goals.  First, this structural remedy would effectively open the beer market to competition and enable a competitor to disrupt and prevent the recurrence of tacit collusion, without imposing the undue and unnecessary burdens that afflict a behavioral remedy.  Second, it would allow independent brewers to have significant expansion capability, which would make such

brewers more effective competitors (they could easily scale up in response to a price increase by Anheuser-Busch or MillerCoors).

In a highly-concentrated industry plagued by coordinated pricing, DOJ's failure to order divestiture of a brewery is part-and-parcel of what makes the behavioral remedy in this matter plainly inadequate and not in the public interest. There is no indication in the government's Complaint, Competitive Impact Statement or Response that the anticompetitive activity has ceased and will not recur. The DOJ failed to show, as it must, how its behavioral remedy will effectively open the relevant beer markets to competition and prevent ongoing tacit collusion.

Accordingly, the Court, on the present record, should deny the Government's motion to find the Proposed Final Judgment in the public interest.

Dated: February 6, 2017

Respectfully submitted,

INTERNATIONAL BROTHERHOOD OF TEAMSTERS

/s/ Allen P. Grunes

Allen P. Grunes
D.C. Bar No. 989298
Maurice E. Stucke
D.C. Bar No. 1028778
THE KONKURRENZ GROUP
5335 Wisconsin Ave., NW
Suite 440
Washington, D.C. 20015
Tel. (202) 644-9760
Fax (202) 888-7522
allengrunes@konkurrenzgroup.com

*Attorneys for Proposed Amicus Curiae*
*INTERNATIONAL BROTHERHOOD OF TEAMSTERS*

# **Exhibit 1**

FILED
03-30-2016
John Barrett
Clerk of Circuit Court
2016CV002536

STATE OF WISCONSIN          CIRCUIT COURT          MILWAUKEE COUNTY

| | |
|---|---|
| PABST BREWING COMPANY, LLC, a Delaware LLC, and BLUE RIBBON INTERMEDIATE HOLDINGS, LLC, a Delaware LLC, 10635 Santa Monica Blvd Ste 350 Los Angeles, CA 90025 | CASE CODE: 30303, 30106 |

Honorable David Borowski-12<br>Branch 12

                         Plaintiffs,

           v.

MILLERCOORS LLC, a Delaware LLC,
250 S. Wacker, Suite 800
Chicago, IL 60606

                         Defendant.

## COMPLAINT

   The plaintiffs, Pabst Brewing Company, LLC ("Pabst") and Blue Ribbon Intermediate Holdings, LLC ("Blue Ribbon") (together, "Plaintiffs"), by and through their attorneys of record, for their Complaint against the defendant, MillerCoors LLC ("MillerCoors" or "Defendant"), upon personal knowledge as to Pabst and Blue Ribbon and upon information and belief as to all other matters, allege as follows:

### NATURE OF THE CASE

   1.     Notwithstanding the parties' longstanding, mutually beneficial relationship and Pabst's reasonable commercial expectations under the parties' agreements, MillerCoors recently decided to abandon Pabst on a baseless determination that it will lack sufficient production capacity in an improper attempt to frustrate Pabst's contract rights, sabotage Pabst's ability to compete and consolidate MillerCoors' already large market share.  As a direct and proximate cause of MillerCoors' breach and related misrepresentations, Pabst and Blue Ribbon have

TEMPORARILY SEALED

12531207.1

suffered, and will continue to suffer, damages estimated at present to be no less than $400 million.

2.      Pabst is a world-renowned brewer of over thirty brands of beer, including such famous brands as Pabst Blue Ribbon, Old Milwaukee and Schlitz.  Since 1999, Pabst has partnered with MillerCoors to produce, package and ship Pabst's various products.  The longstanding relationship between Pabst and MillerCoors has been, and remains, integral to Pabst's ability to compete.

3.      MillerCoors is party to a Brewing Agreement, dated as of January 29, 2007 and subsequently amended eight times, between Pabst, Pearl Brewing, LLC, Falstaff Brewing Company, LLC, General Brewing Company, LLC and Primo Brewing & Malting Company, LLC, on the one hand, and MillerCoors, on the other hand (the "Agreement").  True and correct copies of the Agreement and its eight amendments are annexed hereto as Exhibits A through I, respectively.

4.      The initial term of the Agreement expires in 2020 (the "Initial Term"), and the Agreement contemplates two five-year extensions (the "First Extension Term" and the "Second Extension Term", respectively) to bring the Agreement forward to 2030.   The Agreement grants Pabst the right to exercise, in its sole discretion, an option to extend the Agreement through the First Extension Term if MillerCoors determines that it will have sufficient capacity to continue producing Pabst's products or, in the event that MillerCoors will not have sufficient capacity, if Pabst agrees to participate in a solution to expand MillerCoors' capacity to continue servicing Pabst.  The Agreement requires the parties to work together in good faith to enable Pabst to exercise is bargained-for extension option.

5.     The parties commenced negotiations for the First Extension Term well before September 30, 2015, the contractual deadline to begin negotiations to extend the Agreement through the First Extension Term.   During the parties' negotiations, MillerCoors announced publicly that it will close its brewing facility in Eden, North Carolina (the "Eden Facility")—one of the main facilities that MillerCoors uses to perform its obligations to Pabst under the Agreement.   Plaintiffs understand, from discussions with Defendant as well as from public information, that the planned closure will reduce MillerCoors' production capacity and also devastate the local economy in North Carolina.

6.     In September 2015—also during the parties' extension negotiations, and around the same time that MillerCoors announced its capacity-reducing plan to close the Eden Facility—MillerCoors informed Pabst that it will lack sufficient production capacity to continue performing its obligations to Pabst under the Agreement.   The Agreement requires the parties to discuss—in good faith—potential solutions to any purported capacity constraints, in order to enable Pabst to exercise its option to extend the Agreement through the First Extension Term.

7.     Notwithstanding this requirement, after dropping its capacity-reduction bombshell on Pabst, MillerCoors refused to provide any information to substantiate its supposed capacity determination despite Pabst's repeated requests.   MillerCoors also refused to entertain Pabst's offer to lease the Eden Facility in order to keep it open and continue production of Pabst's products, and was only willing to sell the Eden Facility to Pabst at an astronomical, non-market price.

8.     MillerCoors instead insisted that the Agreement will be terminated at the end of the Initial Term unless Pabst agrees to a commercially devastating, near-triple price increase for

each barrel of Pabst's products produced by MillerCoors—an increase which was in no way tied to increasing MillerCoors' production capacity to continue servicing Pabst.

      9.    The Agreement includes a schedule reflecting the Fixed Charge increases through 2020 (Pabst has added the actual percentage increase in the right-hand column for reference):

| Year | Fixed Charge | Percentage Increase (vs. prior yr charge) |
|------|-------------|-------------------------------------------|
| 2014 | $16.09 | N/A |
| 2015 | $16.45 | 2.24% |
| 2016 | $16.83 | 2.31% |
| 2017 | $17.20 | 2.20% |
| 2018 | $17.59 | 2.27% |
| 2019 | $17.99 | 2.27% |
| 2020 | $18.30 | 1.72% |

(Ex. C § 9.2.B.)

      10.    MillerCoors initially stated that it sought to increase Pabst's Fixed Charge by approximately $1.75 after 2020, to a total of approximately $20 per barrel—an approximately 10% price increase over the 2020 rate—in connection with the contemplated First Extension Term.

      11.    Yet, following a change of executive leadership at MillerCoors and during contract extension discussions in September 2015, MillerCoors informed Pabst of its purported capacity shortfall and proposed a price increase of **$27 per barrel**—which would result in a **$45 per-barrel** Fixed Charge.  This is almost three times what Pabst pays Defendant today under the Agreement, and this proposed solution was not tied in any way to increasing MillerCoors' production capacity to continue producing Pabst's products.

12.    MillerCoors' proposal would represent an unprecedented and intolerable increase from the current Fixed Charge, as well as from the scheduled Fixed Charge for 2020, as illustrated below:

| Year | Fixed Charge | Percentage Increase (vs. prior yr charge) |
|------|-------------|-------------------------------------------|
| 2015 | $16.45 | 2.24% |
| 2020 | $18.30 | 1.72% |
| **2021** | **$45.00 (proposed by MC)** | **146.00%** |

13.    MillerCoors' proposed price increase far outstripped Pabst's reasonable commercial expectations and betrays MillerCoors' true intentions—namely, to deny Pabst its bargained-for extension option and to effect the premature termination of the Agreement.

14.    MillerCoors' so-called proposal came after nearly a year of promises and assurances that it would have sufficient capacity and was prepared to extend the Agreement on commercially reasonable terms.

15.    While Blue Ribbon was contemplating a purchase of Pabst in November 2014, MillerCoors met with Blue Ribbon's senior owners and assured them in express terms that MillerCoors would have sufficient capacity to extend the term of the Agreement, and promised to extend the Agreement on commercially reasonable terms.  MillerCoors did not disclose its purported capacity constraint, including its plan to shutter the Eden Facility, or its intention to abandon Pabst after the Initial Term of the Agreement.  In deciding to proceed with its purchase of Pabst, Blue Ribbon reasonably relied on the repeated promises and representations of MillerCoors, Pabst's longtime partner.  MillerCoors' decision to abandon Pabst after 2020, and its egregious conduct in sabotaging the extension negotiations and vitiating Pabst's bargained-for extension option, threatens both Pabst's ongoing business and Blue Ribbon's investment.

16.    MillerCoors repeatedly assured Pabst that it was prepared to extend the Agreement on commercially reasonable terms.   MillerCoors indicated an extension would approximately entail a modest $1.75 per-barrel price increase.   MillerCoors' current threat to terminate the Agreement after 2020 unless Pabst agrees to a $27 per-barrel price increase— fifteen times greater than the previously discussed increase (*e.g.*, $1.75 increase ppb vs $27 increase ppb)—is damning evidence of MillerCoors' bad faith, especially given the modest price increases contemplated in the Agreement and previously proposed by MillerCoors, as well as MillerCoors' repeated representations that it planned to extend the Agreement on reasonable terms.   Prior to the parties' extension negotiations in September 2015, MillerCoors stated that it would have sufficient capacity and intended to extend the parties' contract, as contemplated in the Agreement.   MillerCoors never disclosed its purported capacity constraint, including its plan to close the Eden Facility, or its intention to deny Pabst its extension option and terminate the Agreement by unleashing a poison pill of a proposed price increase.   MillerCoors' "bait and switch" comprises, among other things, a plain breach of its obligations under the Agreement. Pabst seeks, among other things, an order of specific performance against MillerCoors and in favor of Pabst extending the Agreement through the First Extension Term.

## THE PARTIES, JURISDICTION AND VENUE

17.    Plaintiff Pabst is a Delaware limited liability company with its headquarters in Los Angeles, California.

18.    Plaintiff Blue Ribbon is a Delaware limited liability company with its headquarters in Los Angeles, California.

19.    Defendant MillerCoors is a Delaware limited liability company with its headquarters in Chicago, Illinois.   MillerCoors is a resident and does substantial business in the County of Milwaukee, Wisconsin.

20.     This Court has jurisdiction over MillerCoors because (i) MillerCoors is engaged in substantial and not isolated activities within the State of Wisconsin, (ii) the acts, omissions and events giving rise to Plaintiffs' claims occurred in the State of Wisconsin, and (iii) this action arises out of promises made to Plaintiffs by MillerCoors, and services actually performed by MillerCoors for Pabst, in the State of Wisconsin.  Wis. Stat. §§ 801.05(1)(d), (3), (5).

21.     This Court has original jurisdiction over the subject matter of this action.  Wis. Const. art. VII § 8; Wis. Stat. § 753.03.

22.     Venue is proper in this Court because (i) Plaintiffs' claims arose in the County of Milwaukee and (ii) MillerCoors resides and does substantial business in the County of Milwaukee.  Wis. Stat. § 801.50(2)(a), (c).

23.     The Agreement executed by Pabst and MillerCoors provides that "[a]ll parties consent to the exclusive jurisdiction of the federal or state courts in the state of Wisconsin as having both personal and subject matter jurisdiction and venue in connection with any matter, dispute or cause of action arising hereunder or pursuant hereto."  (Ex. A § 26.)

## FACTUAL ALLEGATIONS

### *Pabst Partners with MillerCoors*

24.     Since 1999, Pabst has partnered with MillerCoors to produce, package and ship Pabst's products.  The parties' business relationship is currently governed by the Agreement, which was executed by the parties in 2007 and amended several times thereafter.  (*See* Exs. A-1.)

25.     While the Agreement's Initial Term will expire on June 30, 2020, Section 2.1 of the Agreement, as amended by Amendment No. 1 to the Agreement and Consent, dated as of June 25, 2010, includes detailed provisions obligating the parties to work together in good faith to extend the parties' relationship beyond 2020 for two successive five-year terms, to 2030, beginning with the First Extension Term from June 30, 2020 through June 30, 2025.  (Ex. B §

2.1.)  The Agreement affords Pabst the option to extend the Agreement, in its sole discretion, through the First Extension Term if MillerCoors will have sufficient production capacity or, in the event that MillerCoors will not have sufficient capacity, if Pabst agrees to participate in a solution to increase MillerCoors' capacity to continue servicing Pabst.  (*Id.* § 2.1.B.1(b), (c).)

26.     The Agreement requires the parties to begin negotiations on the first extension of the Agreement by meeting "[a]s promptly as possible," and no later than ninety days after June 30, 2015, to discuss MillerCoors' ability to continue brewing, packaging and shipping Pabst's products during the First Extension Term.  (*Id.* § 2.1.B.1(a).)

27.     MillerCoors may determine in its sole discretion whether it has "Sufficient Capacity" to continue servicing Pabst's products during the First Extension Term. (*Id.* § 2.1.B.1(a).)  If MillerCoors determines that it will have Sufficient Capacity, Pabst shall have the option to extend the Agreement, "at its sole discretion," through the First Extension Term.  (*Id.* § 2.1.B.1(b).)  If MillerCoors makes a determination that it will not have "Sufficient Capacity," the parties must "discuss possible solutions to address the potential capacity constraints" (termed a "Solution"), including potential additional financial participation by Pabst. (*Id.* § 2.1.B.1(a), (c).)  If the parties agree to a Solution to increase MillerCoors' capacity to continue servicing Pabst, Pabst shall have the option to extend the Agreement, "in its sole discretion," through the First Extension Term.  (*Id.* § 2.1.B.1(c).)

28.     Under Section 9.2.B of the Agreement, Pabst is obligated to pay MillerCoors a per-barrel "Fixed Charge" at a specified amount during each twelve-month Brewing Period. Section 9.2.B provides that, "beginning with the Brewing Period from January 1, 2014 to December 31, 2014 and for each Brewing Period thereafter ... the Fixed Charge shall be increased by 2.25% of the Fixed Charge for the previous Brewing Period."  (Ex. C § 9.2.B.)

29.     The Agreement includes a schedule reflecting these price increases through 2020 (Pabst has added the actual percentage increase in the right-hand column for reference):

| Year | Fixed Charge | Percentage Increase |
|------|--------------|---------------------|
| 2014 | $16.09 | N/A |
| 2015 | $16.45 | 2.24% |
| 2016 | $16.83 | 2.31% |
| 2017 | $17.20 | 2.20% |
| 2018 | $17.59 | 2.27% |
| 2019 | $17.99 | 2.27% |
| 2020 | $18.30 | 1.72% |

(*Id.*)

30.     Section 11.1.A of the Agreement sets forth an auditing procedure to permit Pabst to verify the "pricing, costing and cost accounting procedures used by [MillerCoors] (collectively, the 'Pricing Procedures') as they relate to compliance with this Agreement."  (Ex. A § 11.1.A.)   If Pabst elects to use the auditing procedure in Section 11.1.A, MillerCoors' independent auditors must examine MillerCoors' Pricing Procedures and, thereafter, disclose the results of the audit to Pabst's independent auditors.  (*Id.*)   Pabst's auditors are permitted to "disclose the details of the audit to Pabst to the extent necessary to fully apprise Pabst of the issues underlying the Dispute; provided that in no event shall any competitively sensitive information (including details regarding bills of materials) be disclosed to Pabst for any reason whatsoever."  (*Id.* § 11.1.C.)

### *Blue Ribbon Acquires Pabst*

31.     In May 2014, Eugene Kashper, the principal of what would become Blue Ribbon and the current Chief Executive Officer of Pabst, met with MillerCoors to discuss a potential acquisition of Pabst by Blue Ribbon and the extension of the Agreement.

32.     At that meeting, Mr. Kashper told MillerCoors that the extension of the Agreement was central to Blue Ribbon's decision whether to acquire Pabst.  In response,

MillerCoors assured Mr. Kashper that MillerCoors wanted Pabst to grow and that MillerCoors was satisfied with the parties' relationship, which at the time was 15 years old.   Most importantly, MillerCoors represented that it had sufficient capacity to continue producing Pabst's products, and promised that it would extend the Agreement on commercially reasonable terms, while noting the possibility of additional financial contribution from Pabst.

33.     In reasonable reliance on MillerCoors' assurances, Blue Ribbon acquired Pabst in November 2014.   Blue Ribbon would not have proceeded with the purchase of Pabst had MillerCoors disclosed that it would lack Sufficient Capacity to continue servicing Pabst's products through the First Extension Term, including its intention to close the Eden Facility, and/or that it did not intend to extend the Agreement beyond the Initial Term.

### The Parties Begin Extension Negotiations as Planned

34.     After Blue Ribbon's acquisition of Pabst in November 2014, MillerCoors continued to service Pabst's products without incident or complaint.   About six months later, in April 2015, the parties began negotiating the first extension of the Agreement as previously discussed.   During these discussions, MillerCoors assured Pabst that it would have Sufficient Capacity and intended to extend the Agreement.

35.     In April 2015, MillerCoors agreed to accelerate the extension negotiations, set to begin formally on June 30, 2015 in accordance with Section 2.1.B.1(a) of the Agreement, in order to ensure that the extension would be finalized before the departure of MillerCoors' CEO, Tom Long, in June 2015.   Mr. Long was to be replaced by Gavin Hattersley, Chief Financial Officer of Molson Coors, a co-owner of MillerCoors.

36.     During meetings in April 2015, MillerCoors shared some of its "complexity costing" analysis with Pabst.   This costing analysis purported to indicate that Pabst's products

were, on average, somewhat more costly to produce than MillerCoors' own products and that an increase in Pabst's per-barrel Fixed Charge of approximately **$1.75**—a 10% increase—would cover this difference.

37.     At the time, MillerCoors assured Pabst that MillerCoors was not proposing to switch the variable-cost calculation methodology to the complexity costing method, or to increase the fixed fee, but was simply informing Pabst of the existence of such analysis.

### *MillerCoors Reverses Position after Its New CEO Takes Charge*

38.     In May 2015, MillerCoors effected an abrupt about-face in its long-standing relationship with Pabst.  First, MillerCoors tabled the pending extension discussions.  At the time, MillerCoors assured Pabst that MillerCoors' position on extending the Agreement would not change following Mr. Long's departure.  MillerCoors' assurances, of course, very soon thereafter proved to be false.

39.     Second, in September 2015, Pabst met with MillerCoors' new interim CEO, Mr. Hattersley.  At that meeting MillerCoors backtracked on all of its prior representations about its production capacity and its willingness to extend the Agreement.  MillerCoors further refused to confirm whether it would have Sufficient Capacity during the First Extension Term, even though it was required to inform Pabst before September 30.

40.     On September 14, 2015, MillerCoors launched its next broadside and publicly announced its plans to close the Eden Facility, which employs approximately 500 employees and is the main facility used by MillerCoors to produce Pabst's products.  This news was deeply concerning to Pabst, not only because the closure would impair MillerCoors' production of Pabst's products, but because MillerCoors had failed to provide any advance warning of this long-planned closure to Pabst, its longtime partner.

41.     Pabst immediately asked if MillerCoors would consider continuing production at the Eden Facility but MillerCoors refused to entertain any such suggestion, insisting on mothballing the Eden Facility and taking all production at the facility off-line, underline regardless of any possible financial contribution by Pabst.

### MillerCoors' Bad Faith Proposal

42.     In an email on September 21, 2015, just nine days before the deadline for the parties to "meet to . . . discuss any issues which may affect MillerCoors' ability to brew, process or package [Pabst's] Brands during the First Extension Term, including . . . any anticipated or potential capacity constraints" (Ex. A § 2.1.B.1(a)), MillerCoors informed Pabst that it would not have Sufficient Capacity to produce Pabst's products during the First Extension Term.  This determination was perplexing and dispelled any notion of MillerCoors' good faith, in view of MillerCoors' heretofore consistent representations that it would have sufficient capacity to continue to service Pabst.  Pabst lacked any ability to test or otherwise validate MillerCoors' assertion because MillerCoors refused to provide Pabst with the needed information, under the ruse that providing such information—even on a double-blind basis to Pabst's auditors, who would not share it with Pabst business personnel—would violate antitrust laws.  MillerCoors further argued that it had absolute discretion to do whatever it wanted to do with respect to its capacity under the terms of the Agreement, notwithstanding Pabst's bargained-for and valuable extension option.

43.     Shut out from any reasonable discussion concerning the Eden Facility, Pabst immediately sought to negotiate a reasonable solution to MillerCoors' just-announced capacity constraint.   On September 23, 2015, the parties met to discuss the extension of the Agreement.  MillerCoors reiterated that it would not have Sufficient Capacity during the First Extension

Term.  MillerCoors claimed, again without providing a stitch of support, that it makes "no money" producing Pabst's products.  This was the first time in the history of the parties' business relationship, which now dates back sixteen years to 1999, that MillerCoors ever stated that its production of Pabst's products was not profitable for MillerCoors.  This claim was facially false and made in bad faith.

44.    MillerCoors' capacity determination also contradicted over a year of assurances that it would have sufficient capacity.

45.    In order to extend the Agreement, MillerCoors insisted on but one "Solution," which was not a solution at all but rather a "poison pill": a proposed **$27 per-barrel Fixed Charge increase** after the end of the Initial Term, which would result in a **$45 per-barrel Fixed Charge**.  This proposed Fixed Charge for 2021 far exceeds the $18.30 Fixed Charge scheduled for 2020 under the Agreement (*see* Ex. C § 9.2.B), and was more than double the roughly $20 Fixed Charge suggested by MillerCoors' "complexity costing" analysis in April 2015, five months earlier.

46.    Every Wisconsin commercial contract carries with it a duty of good faith and fair dealing, and the Agreement is no different.  MillerCoors' proposed "Solution" was manifestly unreasonable and in bad faith.  The so-called "Solution" was in no way tied to MillerCoors' actual costs associated with maintaining capacity for Pabst as required by the Agreement, or on any other commercial basis ever disclosed to Pabst.  MillerCoors knew that its so-called "Solution" would be, and is, a commercial non-starter intended to terminate the parties' contractually required "good faith" extension negotiations and deprive Pabst of its bargained-for extension option, and thereby force the termination of the parties' longstanding relationship and render Pabst's business inviable.

47.     MillerCoors explained at the September 23 meeting that its capacity constraint was caused by a strategy to realign MillerCoors' production capacity to service only its own production.   MillerCoors never before informed Pabst of such a strategy and its potential effect on MillerCoors' capacity.   To the contrary, MillerCoors had repeatedly assured Pabst that it would have sufficient capacity to extend the Agreement.   This is simply a case of a new CEO walking away from the contractual promises and undertakings of a former CEO, without regard to Defendant's longstanding and preexisting legal obligations.

### Pabst Escalates Negotiations But MillerCoors Refuses to Engage

48.     Since September 23, Pabst has spent months attempting to obtain factual information to understand MillerCoors' Sufficient Capacity determination and its proposed Solution—all to no avail.   MillerCoors claimed that it could not share any information with Pabst due to unspecified antitrust concerns, notwithstanding the fact that the Agreement contains audit provisions to allow Pabst to confirm MillerCoors' Pricing Procedures through an independent auditor.

49.     On October 15, 2015, Pabst tried to resolve this dispute by delivering a letter from Mr. Kashper, Pabst's CEO, to MillerCoors' Senior Vice President for Finance, informing MillerCoors that Pabst did not accept either MillerCoors' Sufficient Capacity determination or its proposed Solution.   On November 20, 2015, a follow-up letter from Pabst's counsel was delivered to MillerCoors, expanding upon Pabst's disagreement with MillerCoors' Sufficient Capacity determination and proposed Solution as well as Pabst's concerns with MillerCoors' conduct during the extension discussions.   True and correct copies of the October 15 and November 20 letters are attached as Exhibits J and K, respectively.   Thereafter, Pabst and MillerCoors continued to engage in management-level discussions involving Pabst's CEO, to

resolve the parties' disagreement over MillerCoors' Sufficient Capacity determination and the proposed Solution.

50.     Due to MillerCoors' refusal to negotiate in good faith, Pabst is unable, as of this date, to exercise its valuable, bargained-for option to extend the Agreement.  Pabst brings this action in order to preserve the status quo, to obtain judicial enforcement of its longstanding commercial rights and, if necessary, for damages stemming from Defendant's bad faith actions and conduct.

## CLAIMS FOR RELIEF

## COUNT I – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (AGAINST DEFENDANT ON BEHALF OF PABST)

51.     Plaintiffs incorporate by reference each and every factual allegation in paragraphs 1 to 50 as though fully set forth herein.

52.     Pabst and MillerCoors are parties to the Agreement, which requires the parties to negotiate in good faith to enable Pabst to exercise its option to extend the Agreement, in its sole discretion, through the First Extension Term.

53.     Pabst satisfied all of its obligations under the Agreement and was not in breach of any provision of the Agreement.

54.     During the parties' extension negotiations under Section 2.1 of the Agreement, which are required by contract and law to be conducted in good faith, MillerCoors acted in bad faith and frustrated Pabst's valuable, bargained-for extension rights.   First, MillerCoors determined in bad faith that it will lack Sufficient Capacity after the Initial Term, having previously made to Plaintiffs repeated assurances that Defendant would have Sufficient Capacity, including after deciding to close the Eden Facility.   Compounding its bad faith,

MillerCoors then refused to provide Pabst with needed information to substantiate this Sufficient Capacity determination.

55.     Further, MillerCoors' proposed Solution was made in bad faith given the dramatic "poison pill" increase in the proposed Fixed Charge over the existing rates in the Agreement and in view of MillerCoors' own representations just several months earlier.

56.     As a direct and proximate consequence of MillerCoors' breach Pabst has suffered, and will continue to suffer contract damages, in an amount to be proven at trial but estimated, at present, to be no less than $400 million.

## COUNT II – PROMISSORY ESTOPPEL
## (AGAINST DEFENDANT ON BEHALF OF BLUE RIBBON)

57.     Plaintiffs incorporate by reference each and every factual allegation in paragraphs 1 to 56 as though fully set forth herein.

58.     MillerCoors promised Mr. Kashper, a principal of Blue Ribbon and the eventual CEO of Pabst, that MillerCoors would honor Pabst's extension right and extend the Agreement through the First Extension Term on reasonable terms, and assured Mr. Kashper that MillerCoors would have Sufficient Capacity to continue producing Pabst's products.

59.     MillerCoors knew that the extension of the Agreement was integral to Blue Ribbon's decision to purchase Pabst, and MillerCoors should reasonably have expected that its promise and assurances would cause Blue Ribbon to move forward with its purchase of Pabst.

60.     Blue Ribbon purchased Pabst in November 2014.

61.     Blue Ribbon purchased Pabst in reliance on MillerCoors' promise and assurances, and it was reasonable and justified for Blue Ribbon to rely on MillerCoors' promise and assurances given MillerCoors' longstanding partnership with Pabst.   Blue Ribbon would not

have purchased Pabst had MillerCoors disclosed that it would not have Sufficient Capacity, planned to frustrate Pabst's extension right, and/or did not intend to extend the Agreement.

62.    Injustice can be avoided only if MillerCoors' promise is enforced.

## COUNT III – STRICT LIABILITY FOR MISREPRESENTATION
## (AGAINST DEFENDANT ON BEHALF OF PABST AND BLUE RIBBON)

63.    Plaintiffs incorporate by reference each and every factual allegation in paragraphs 1 to 62 as though fully set forth herein.

64.    As detailed herein, MillerCoors made numerous representations of fact to Plaintiffs, including (but not limited to) representations that MillerCoors would have sufficient capacity to service Pabst, would honor Pabst's extension right and would extend the Agreement on commercially reasonable terms, and that the planned price increase for the First Extension term would be approximately 10%.  At no time did MillerCoors inform Pabst or Blue Ribbon that it planned to shutter the Eden Facility used to perform Defendant's contractual obligations, nor that as a result of this determination MillerCoors lacked capacity to continue to honor its obligations to Plaintiffs, nor that MillerCoors planned to vitiate Plaintiffs' bargained-for extension rights by demanding, among other things, a price increase approximately fifteen times greater than the increase previously discussed by the parties just a few months earlier.

65.    These representations of fact by MillerCoors were untrue.

66.    MillerCoors made these misrepresentations of fact based upon its own personal knowledge, using information not available to Plaintiffs and which MillerCoors refused to share with Plaintiffs.

67.    MillerCoors stands to benefit financially from these misrepresentations and is economically interested in them.

68.     Plaintiffs, with justification, believed MillerCoors' many representations to be true and relied upon them, as described herein.

69.     As a direct and proximate consequence of MillerCoors' misrepresentations, Plaintiffs have suffered, and will suffer, damages in an amount to be proven at trial, including actual, incidental and consequential damages.

## COUNT IV – FRAUD
## (AGAINST DEFENDANT ON BEHALF OF BLUE RIBBON)

70.     Plaintiffs incorporate by reference each and every factual allegation in paragraphs 1 to 69 as though fully set forth herein.

71.     MillerCoors represented to Mr. Kashper, a principal of Blue Ribbon and the eventual CEO of Pabst, that MillerCoors would honor Pabst's extension right, extend the Agreement through the First Extension Term on reasonable terms and have Sufficient Capacity to continue producing Pabst's products.

72.     MillerCoors' representations were false.   At the time of its representations, MillerCoors knew that it would not have Sufficient Capacity, that it planned to close the Eden Facility and that it did not have the intention to extend the Agreement.   MillerCoors wrongfully concealed these facts from Mr. Kashper during their discussions.   MillerCoors was under a duty to disclose such facts to Mr. Kashper and Blue Ribbon to clarify MillerCoors' false statements of fact that it would have Sufficient Capacity and intended to extend the Agreement.

73.     MillerCoors knew that its representations were false when they were made to Mr. Kashper and Blue Ribbon.

74.     MillerCoors made its misrepresentations, and omissions, with the intent to deceive Mr. Kashper and Blue Ribbon, or at least with reckless disregard as to the truth or falsity of its misrepresentations.

75.     MillerCoors intended to induce Mr. Kashper and Blue Ribbon to purchase Pabst in reliance on its misrepresentations or omissions.

76.     Blue Ribbon justifiably relied on MillerCoors' misrepresentations and omissions in deciding to purchase Pabst.

77.     As a direct and proximate consequence of MillerCoors' misrepresentations and omissions, Blue Ribbon has suffered and will suffer damages in an amount to be proven at trial, including actual, incidental and consequential damages.

78.     MillerCoors acted maliciously, and with bad intent, toward Blue Ribbon and in intentional disregard of the rights of Blue Ribbon.  Blue Ribbon is thus also entitled to an award of punitive damages.  Wis. Stat. § 895.043.

### COUNT V – NEGLIGENCE
### (AGAINST DEFENDANT ON BEHALF OF BLUE RIBBON)

79.     Plaintiffs incorporate by reference each and every factual allegation in paragraphs 1 to 78 as though fully set forth herein.

80.     MillerCoors owed a duty of care to Mr. Kashper and Blue Ribbon to disclose that MillerCoors would lack Sufficient Capacity during the First Extension Term and that it had a strategy of realigning MillerCoors' production capacity to service only its own products, based on its affirmative representations that it would have Sufficient Capacity and intended to extend the Agreement.

81.     MillerCoors breached its duty of care.

82.     As a direct and proximate consequence of MillerCoors' breach, Blue Ribbon has suffered and will suffer damages in an amount to be proven at trial.

TEMPORARILY SEALED

## COUNT VI – DECLARATORY AND INJUNCTIVE RELIEF
## (AGAINST DEFENDANT ON BEHALF OF PLAINTIFFS)

83.     Plaintiffs incorporate by reference each and every factual allegation in paragraphs 1 to 82 as though fully set forth herein.

84.     In accordance with the Uniform Declaratory Judgments Act, Wis. Stat. § 806.04, (i) a present controversy exists in which Plaintiffs have asserted claims against MillerCoors, (ii) the parties have adverse interests in such controversy, (iii) Plaintiffs have a legally protectable interest in the controversy, and (iv) the controversy is ripe for judicial determination.

85.     Plaintiffs seek a judicial declaration of rights as to their respective causes of action including the remedies sought in connection therewith, specifically including (but not limited to) preliminary and permanent injunctive relief enjoining MillerCoors from any further breach or termination of its obligations to Plaintiffs under the Agreement.

## COUNT VII – SPECIFIC PERFORMANCE
## (AGAINST DEFENDANT ON BEHALF OF PABST)

86.     Plaintiffs incorporate by reference each and every factual allegation in paragraphs 1 to 85 as though fully set forth herein.

87.     No legal remedy will adequately compensate Pabst for MillerCoors' bad faith refusal to permit Pabst to exercise its bargained-for extension option.

88.     MillerCoors' breach of its duty of good faith and fair dealing was substantial and threatens Pabst's viability.  The balance of the equities favors enforcement of Section 2.1.B.1 of the Agreement.

89.     The Court should specifically enforce the Agreement by extending it through the First Extension Term, at a reasonable Fixed Charge increase to be determined at trial.

90.     An award of specific performance would not be unfair, unreasonable or impossible.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

A.      Seeking preliminary and permanent injunctive relief preventing Defendant's wrongful termination of the Brewing Agreement, including all of its obligations thereunder;

B.      Ordering specific performance extending the Agreement in favor of Pabst through the First Extension Term, at a reasonable Fixed Charge increase;

C.      Ordering compensation for all damages suffered, or to be suffered, by Pabst as a result of Defendant's conduct with respect to Pabst;

D.      Ordering compensation for all damages suffered, or to be suffered, by Blue Ribbon as a result of Defendant's conduct with respect to Blue Ribbon;

E.      Awarding punitive damages to Blue Ribbon as result of Defendant's conduct with respect to Blue Ribbon;

F.      Declaring that Defendant is liable to Pabst for breach of the implied covenant of good faith and fair dealing and/or strict liability for misrepresentation, and awarding any and all requested relief in connection therewith;

G.      Declaring that Defendant is liable to Blue Ribbon for promissory estoppel, strict liability, fraud and/or negligence, and awarding any and all requested relief in connection therewith;

H.      Awarding Pabst its reasonable attorneys' fees and costs pursuant to Section 34 of the Agreement, and to the fullest extent allowed by law; and

I.      Granting any and all such additional or further relief as this Court deems just and equitable under the circumstances.

12531207.1                                          -21-

**JURY DEMAND**

Pursuant to Wis. Stat. §§ 805.01 and 756.06, Plaintiffs hereby demand a trial by a

jury of twelve persons on all claims so triable.

Dated this 30th day of March, 2016.

WHYTE HIRSCHBOECK DUDEK S.C.
Attorneys for Plaintiffs

By:   s/Ross A. Anderson
Ross A. Anderson
State Bar No. 1018368
Emily A. Constantine
State Bar No. 1087257

P.O. ADDRESS:
555 East Wells Street, Suite 1900
Milwaukee, Wisconsin 53202-3819
414-273-2100
414-223-5000 (fax)
randerson@whdlaw.com
econstantine@whdlaw.com

Of counsel (*pro hac vice* applications forthcoming):

Adam S. Paris
John D. Echeverria
**SULLIVAN & CROMWELL LLP**
1888 Century Park East
Los Angeles, California 90067
(310) 712-6600

TEMPORARILY SEALED